CITY OF OAK CREEK, by its Water
and Sewer Utility Commission,
Petitioner-Appellant,†

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, and
City of Franklin, by its Board of
Water Commissioners,
Respondents-Respondents,

Court of Appeals

*No. 2005AP741. Submitted on briefs January 3, 2006.
—Decided March 21, 2006.*

2006 WI App 83

(Also reported in 716 N.W.2d 152.)

† Petition to review denied 6-14-06.

119

Fɪɴᴇ, J., dissents.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Boardman, Suhr, Curry & Field LLP* by *Lawrie J. Kobza* and *Matthew D. Weber*, Madison.

On behalf of the respondent-respondent Public Service Commission of Wisconsin, the cause was submitted on the brief of *Edward S. Marion*, Madison.

ˏ On behalf of the respondent-respondent City of Franklin, by its Board of Water Commissioners, the cause was submitted on the brief of *Piper & Schmidt* by *Joseph M. Wirth* and *Jon D. Monson*, Milwaukee.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. WEDEMEYER, P.J. The City of Oak Creek, by its Water and Sewer Utility Commission (Oak Creek) appeals from a decision of the circuit court affirming a July 26, 2004 final decision and order of the Public Service Commission (PSC) requiring Oak Creek to reconvey to the City of Franklin, without compensation, title to certain contributed water utility infrastructure used by Oak Creek to service City of Franklin retail water customers.[1] Because the PSC's order comports with its statutory authority and the basis for Oak

---

[1] The final decision and order also required Oak Creek to transfer back to the City of Franklin 1600 residential water

125

Creek's claims of error is not more reasonable than the basis for the PSC's order, we affirm.

## BACKGROUND

¶ 2. Franklin and Oak Creek are two adjacent municipalities located in southern Milwaukee County. Franklin is located in southwestern Milwaukee County, while Oak Creek is located in the southeastern part of the county along Lake Michigan. In the 1970's, Franklin quickly developed from a rural setting to a suburb. Whereas, historically, the city's residents had relied on private wells for water consumption, the need for additional sources for water became obvious. Franklin began negotiating with adjacent municipalities to fulfill its needs. It entered into two retail sales agreements with Oak Creek to obtain water for some of its residents in newly developing subdivisions. On October 8, 1973, the PSC approved a thirty-year agreement enabling Oak Creek to provide water for Franklin's Southwood East subdivision. By the terms of the agreement and order of approval, Franklin was to construct the water mains and appurtenances (infrastructure or assets). Pursuant to PSC policy that a water utility shall provide retail water service over facilities which it owns, part of the order required Franklin to convey ownership of the infrastructure to Oak Creek. The order did not require Franklin to repurchase the infrastructure or address any issue of compensation related to reacquiring the assets at the expiration of the agreement.

¶ 3. On March 21, 1979, Franklin and Oak Creek entered into a second agreement to supply retail water to another newly developed Rawson subdivision in

customers that it had been servicing since 1973. Oak Creek does not appeal that part of the order.

Franklin. The terms and conditions were basically the same as the agreement for the Southwood East subdivision except for the dates. The PSC approved the Rawson agreement on May 10, 1979.

¶ 4. In the mid-1980's, Franklin experienced additional well water quality problems and, as a result, began to negotiate with the City of Milwaukee and the City of Oak Creek for a wholesale source of Lake Michigan water. On April 4, 1994, Franklin reached a wholesale agreement with Oak Creek. As part of the negotiations, the Rawson agreement was amended so that its expiration date was the same as the Southwood East agreement, i.e., October 8, 2003. When Franklin petitioned for approval of the wholesale agreement, Oak Creek quite naturally supported approval of the agreement. The City of Milwaukee, however, objected to approval on the basis that it was not reasonable under Wis. Stat. § 196.49 (1993–94).[2] A contested proceeding

---

[2] WISCONSIN STAT. § 196.49 provides:

**Authorization from commission before transacting business; extensions and improvements to be approved; enforcement of orders; natural gas.**

**(1)** (ag) In this subsection, "public utility" does not include a telecommunications utility.

(am) No public utility not legally engaged in performing a utility service on August 1, 1931, in any municipality may commence the construction of any public utility plant, extension or facility, or render service in such municipality directly, or indirectly by serving any other public utility or agency engaged in public utility service or otherwise, unless the public utility has obtained a certificate from the commission authorizing it to transact public utility business.

(b) This subsection applies only to a public utility which was not legally engaged in performing a public utility service on August 1, 1931, in a municipality and which proposes to commence construction or render service in the municipality. If there is a

public utility engaged in similar service in operation under an indeterminate permit in the municipality, ss. 196.495 and 196.50 apply.

(2) No public utility may begin the construction, installation or operation of any new plant, equipment, property or facility, nor the construction or installation of any extension, improvement or addition to its existing plant, equipment, property, apparatus or facilities unless the public utility has complied with any applicable rule or order of the commission and with s. 144.026, if applicable. If a cooperative association has been incorporated under ch. 185 for the production, transmission, delivery or furnishing of light or power and has filed with the commission a map of the territory to be served by the association and a statement showing that a majority of the prospective consumers in the area are included in the project, no public utility may begin any such construction, installation or operation within the territory until after the expiration of 6 months from the date of filing the map and notice. If the cooperative association has entered into a loan agreement with any federal agency for the financing of its proposed system and has given written notice of the agreement to the commission, no public utility may begin any construction, installation or operation within the territory until 12 months after the date of the loan agreement.

(3) (a) In this subsection, "project" means construction of any new plant, equipment, property or facility, or extension, improvement or addition to its existing plant, equipment, property, apparatus or facilities. The commission may require by rule or special order that a public utility submit, periodically or at such times as the commission specifies and in such detail as the commission requires, plans, specifications and estimated costs of any proposed project which the commission finds will materially affect the public interest.

(b) Except as provided in par. (d), the commission may require by rule or special order under par. (a) that no project may proceed until the commission has certified that public convenience and necessity require the project. The commission may refuse to certify a project if it appears that the completion of the project will do any of the following:

1. Substantially impair the efficiency of the service of the public utility.

128

2. Provide facilities unreasonably in excess of the probable future requirements.

3. When placed in operation, add to the cost of service without proportionately increasing the value or available quantity of service unless the public utility waives consideration by the commission, in the fixation of rates, of such consequent increase of cost of service.

(c) The commission may issue a certificate for the project or for any part of the project which complies with the requirements of this section, or the commission may attach to the issuance of its certificate such terms and conditions as will ensure that the project meets the requirements of this section. The issuance of a certificate under this section shall not be a condition precedent to the exercise of eminent domain under ch. 32.

(d) A telecommunications utility is not required to obtain commission certification before beginning a construction project.

(5) (a) No public utility furnishing gas to the public in this state may construct, install or place in operation any new plant, equipment, property or facility, or construct or install any extension, improvement, addition or alteration to its existing plant, equipment, property or facilities for the purpose of connecting its properties and system to a source of supply of gaseous fuel for sale to the public which is different from that which has been sold previously, or for the purpose of adapting its facilities to use the different kind of gaseous fuel unless the commission certifies that the general public interest and public convenience and necessity require the connection to or use of the different fuel. No public utility may substitute natural gas or a mixture of natural and manufactured gas in lieu of manufactured gas for distribution and sale to the public unless it has obtained from the commission a certificate that the general public interest and public convenience and necessity require the substitution.

(b) Proceedings for a certificate under par. (a) shall be commenced by petition to the commission in a form prescribed by the commission, furnishing such information as the commission by rule or order prescribes. The commission shall prescribe the form of notice, to whom the notice shall be given, and how notice shall be given.

129

## Franklin/Oak Creek wholesale agreement and the amendment to the Rawson agreement.

(c) A petition under par. (b) may include one or more municipalities, may be made by one or more public utilities as a joint petition, by any other interested person or by a public utility and any other interested person. The commission may direct the consolidation, separation or consideration of separate petitions as it deems necessary or expedient to a prompt hearing and disposition of the issue.

(d) Upon the filing of a petition under par. (b), notice of hearing on the petition shall be given by the person filing the petition by publication of a class 2 notice, under ch. 985, or by mailing or personal service, as the commission directs by the order under par. (b). Notice under this paragraph shall be given at least 2 weeks prior to hearing on the petition. Proof of notice shall be filed as directed by the commission.

(e) The commission, with or without an order, prior to or during any hearing under this subsection, may frame and prescribe special issues and limit the issues or the nature and extent of proof so as to avoid unnecessary duplication. The commission, with or without an order, may proceed with the hearing as to part of a petition under par. (b) as it may find desirable to a full but speedy hearing upon the petition.

(f) The commission may accept as presumptive evidence in a commission proceeding the facts found in findings and orders of the federal energy regulatory commission or any federal agency having jurisdiction as to the availability of adequate supplies of natural gas, the adequacy or sufficiency of equipment and facilities to be employed in the delivery or storage of natural gas for any public utility, and any similar findings or determinations affecting the seller or person furnishing natural gas to any public utility and material to the ultimate determination of the issues in the proceeding. The commission may accept and take judicial notice of its own files and records, including all proceedings and the evidence therein which it finds to be material and relevant. The commission shall give notice of the taking of judicial notice under this paragraph prior to the conclusion of final hearings upon any proceeding so as to give interested parties the right to object to acceptance of the evidence or to contradict the evidence by other competent evidence.

(g) A certificate granted under par. (a) shall be authorized by an order following a hearing. The order shall contain any condition

¶ 5. The December 28, 1994 decision specifically required that: "[A]ll of the approximately 1,000 customers in Franklin who are currently receiving retail water service from Oak Creek, will be transferred so

or limitation which the commission deems necessary or practicable, including, but not limited to, exceptions or regulations as to specific communities or public utilities, provision for protection of employes under existing labor contracts, as well as other employes, so as to avoid unemployment, regulations for accounting for expenses for change-over to the use of natural gas where necessary and to the extent necessary, provision for amortization of any expenditure or other items, and any other regulation, condition and limitation which the commission considers necessary in the public interest.

(h) The commission by order may extend a certificate under par. (a) to more than one public utility or municipality. The commission may prescribe different conditions and regulations for each public utility or municipality if the commission deems the different conditions and regulations necessary to carry out the purposes of this section.

(i) In making a determination under this section, the commission shall consider all appropriate factors affecting the public interest, including, but not limited to, when the substitution of natural or a mixture of natural and manufactured gas is involved, the likelihood of substantial rate reduction from the substitution and the effect of the substitution upon employment, existing business and industries, railroads and other transportation agencies and facilities, upon conveniences, economies and savings to consumers, upon existing gas utilities and their ability to continue to serve the public and upon the state, any of its political subdivisions or any citizen or resident of the state.

(6) If the commission finds that any public utility has taken or is about to take an action which violates or disregards a rule or special order under this section, the commission, in its own name either before or after investigation or public hearing and either before or after issuing any additional orders or directions it deems proper, may bring an action in the circuit court of Dane county to enjoin the action. If necessary to preserve the existing state of affairs, the court may issue a temporary injunction pending a hearing upon the merits. An appeal from an order or judgment of the circuit court may be taken to the court of appeals.

that all of these residents become retail water customers of Franklin within 10 years or sooner as allowed by the agreements between these two municipalities."

¶ 6. Within the agreements and order of approval, there was no determination of the methodology for transferring the customers or the infrastructure back to Franklin. As the termination date for the retail water agreements drew near, no accommodation was reached as to the transfer of the customers and infrastructure.

¶ 7. As a consequence, on July 29, 2003, Franklin filed a petition with the PSC requesting that Oak Creek be ordered to transfer customers and contributed assets on October 8, 2003, at no charge. In doing so, it requested the PSC, under the power vested in it by WIS. STAT. § 196.30 (2003–04)[3] and more particularly pursuant to WIS. STAT. §§ 196.39 and 196.37(2),[4] to amend and

---

[3] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[4] WISCONSIN STAT. § 196.39 provides, in pertinent part:

**Change, amendment and rescission of orders; reopening cases. (1)** The commission at any time, upon notice to the public utility and after opportunity to be heard, may rescind, alter or amend any order fixing rates, tolls, charges or schedules, or any other order made by the commission, and may reopen any case following the issuance of an order in the case, for any reason.

. . . .

**(3)** Any order rescinding, altering, amending or reopening a prior order shall have the same effect as an original order.

WISCONSIN STAT. § 196.37(2) provides:

**Lawful rates; reasonable service. . . .**

**(2)** If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service

alter its orders of October 8, 1973, and December 28, 1994, to effectuate the request. After a contested hearing and the lengthy submission of evidence, the PSC ordered Oak Creek to transfer all of its Franklin retail customers and the related contributed water utility infrastructure at no cost to Franklin. It based its decision upon its general supervisory authority as contained in Wis. Stat. ch. 196, principles of contract, and the application of judicial estoppel to foreclose any claim by Oak Creek for compensation for the return of assets. Oak Creek petitioned the circuit court of Milwaukee County to review the decision of the PSC. The circuit court affirmed the decision of the PSC. Oak Creek now appeals to this court.

## ANALYSIS

¶ 8. Oak Creek's challenge to the propriety of the PSC decision and order essentially consists of three claims: (1) the PSC exceeded its authority in concluding that the December 28, 1994 order required Oak Creek to transfer the donated water utility infrastructure to Franklin at no cost, there being no language in the 1994 order that addressed the issue of transferring the infrastructure assets; (2) Oak Creek never agreed to transfer the assets back to Franklin at no cost; and (3) it is not barred from asserting a claim for compensation by judicial estoppel. We shall address each issue raised by Oak Creek as appropriate for the disposition of this appeal.

which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed in the future.

## STANDARDS OF REVIEW AND APPLICABLE LAW

■

¶ 9. The Franklin and Oak Creek Water Utilities are regulated public utilities as defined under WIS. STAT. § 196.01, and thereby subject in their operations to all the pertinent rules, regulations, and orders promulgated under WIS. STAT. ch. 196. Water utilities that operate under the jurisdiction and supervision of the PSC are deemed to be cognizant of the commission's authority.

■

¶ 10. Although this is an appeal from a circuit court decision, we review the decisions of an administrative agency, in this case the PSC, not those of the trial court. *See Wisconsin Pub. Serv. Corp. v. Public Serv. Comm'n,* 156 Wis. 2d 611, 616, 457 N.W.2d 502 (Ct. App. 1990). On review, we shall separately address disputed issues of agency procedure, interpretations of law, and determinations of fact or policy within the agency's exercise of delegated discretion. WIS. STAT. § 227.57(3).

■

¶ 11. An agency's findings of fact are conclusive on appeal if they are supported by credible and substantial evidence. *See* WIS. STAT. § 102.23(6). Credible evidence is that evidence which excludes speculation or conjecture. *See Bumpas v. DILHR,* 95 Wis. 2d 334, 343, 290 N.W.2d 504 (1980). Evidence is substantial if a reasonable person relying on the evidence might make the same decision. *See Bucyrus-Erie Co. v. DILHR,* 90 Wis. 2d 408, 418, 280 N.W.2d 142 (1979).

■

¶ 12. In reviewing the PSC's findings of fact, we ought not look to see whether substantial evidence

134

supports alternative findings that the court would make or that the PSC may have failed to make. *See Graebel Moving & Storage of Wis. v. LIRC*, 131 Wis. 2d 353, 356, 389 N.W.2d 37 (Ct. App. 1986). We need only look to see what substantial evidence supports the decision actually made. *See id.*

¶ 13. The credibility of the witnesses and the persuasiveness of their testimony are for the commission, not for the courts, to determine. *L & H Wrecking Co. v. LIRC*, 114 Wis. 2d 504, 509, 339 N.W.2d 344 (Ct. App. 1983). "In applying the credible evidence test to findings of the [commission], a reviewing court does not weigh conflicting evidence to determine which should be believed." *Id.* "If there is credible evidence to sustain the finding, irrespective of whether there is evidence that might lead to the opposite conclusion, a court must affirm." *Id.*

¶ 14. When reviewing conclusions and statutory interpretations of the PSC, there are three different levels of deference that may be applied depending upon the appropriate circumstances. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 659–60, 539 N.W.2d 98 (1995). The highest"great deference"will be accorded an agency's decision when: (1) the agency is charged with the administration of the particular statute at issue; (2) its interpretation is one of long-standing; (3) it employed its "expertise or specialized knowledge" in arriving at its interpretation; and (4) its interpretation will provide "uniformity and consistency in the application of the statute." *Id.* at 660. "Where great deference is appropriate, the agency's interpretation will be sustained if it is reasonable—even if an alternative reading of the statute is more reasonable." *Barron Elec. Coop. v.*

135

*Public Serv. Comm'n*, 212 Wis. 2d 752, 761, 569 N.W.2d 726 (Ct. App. 1997). We will also defer to an agency's interpretation " 'if it is intertwined with value and policy determinations' inherent in the agency's statutory decisionmaking function." *Id.*

¶ 15. The second level of deference—"due-weight"deference—is appropriate when the agency has some expertise in the area in question, but has not developed that expertise to the extent that would necessarily place it in a better position to make judgments concerning the interpretation of the statute than a court. *Id.* at 762. Here too, we "sustain the agency's interpretation if it is reasonable—even if another interpretation is equally reasonable." *Id.* at 763. Unlike the situation where great deference is appropriate however, due-weight deference will not permit sustaining the agency's interpretation if another interpretation is more reasonable. *Id.* at 763.

¶ 16. In cases at the third level, we consider the issues *de novo,* paying no deference at all to the agency's legal conclusions or statutory interpretations. *Id.* at 763. These are cases where the issue before the agency is " 'clearly one of first impression,' " or where the agency's position on the issue has been so inconsistent as to provide " 'no real guidance.' " *Id.* (citation omitted). In that situation " 'the weight to be afforded [the agency's] interpretation is no weight at all.' " *Id.* (citation omitted).

¶ 17. The parties disagree as to which standard of review ought to be applied in this appeal. Oak Creek claims a *de novo* review is the appropriate standard. It advances this position because in this instance, review of the PSC's decision requires us to review and interpret

the PSC's 1994 order, a legal issue which is in the province of the court. *See Northwestern Wis. Elec. Co. v. Public Serv. Comm'n*, 248 Wis. 479, 484–85, 22 N.W.2d 472 (1946). It further reasons that in construing the administrative order, the court per force must look to the underlying contracts whose interpretation should be reviewed by the *de novo* standard.

¶ 18. The PSC argues that it is entitled to due-weight deference based upon its experience, technical competence and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it under Wis. Stat. § 227.57(10).

¶ 19. Franklin claims that the great-weight standard should be applied because policy decisions are inextricably part of the basis for the agency's decision. "[W]hen a legal question calls for value and policy judgments that require the expertise and experience of an agency, the agency's decision, although not controlling, is given great weight deference." *Brown v. LIRC*, 2003 WI 142, ¶ 16, 267 Wis. 2d 31, 671 N.W.2d 279.

¶ 20. We conclude the PSC's decision will be reviewed under the due-weight standard. Although the circumstances of this case are unprecedented, the PSC is charged with executing the statutory scheme under examination and has considerable experience in dealing with retail water service agreements. Furthermore, it has the residuary power to alter or amend its own previously entered orders. *See* Wis. Stat. §§ 196.37(2), 196.39(1).

## A. SCOPE OF PSC'S AUTHORITY

¶ 21. We first address the basic issue of whether the PSC had the authority to order the reconveyance of

137

the water infrastructure system to Franklin. Oak Creek claims that without its consent, the PSC lacked authority to require a utility to divest itself of assets. Oak Creek argues that the PSC's involvement in involuntary asset transfers is limited to condemnation proceedings in Wis. Stat. ch. 197 of the Wisconsin Statutes. This controversy does not involve a condemnation proceeding. Furthermore, Oak Creek asserts "nothing in Chapter 196 . . . suggests or implies that the PSC has the authority to order the involuntary transfer of property from one utility to another . . . ." For reasons that will be stated, we are not persuaded.

¶ 22. The PSC's power to act is limited by statute. *Friends of the Earth v. Public Serv. Comm'n*, 78 Wis. 2d 388, 400, 254 N.W.2d 299 (1977). The PSC "has only those powers which are expressly conferred or which are necessarily implied by the statutes under which it operates." *Kimberly-Clark Corp. v. Public Serv. Comm'n*, 110 Wis. 2d 455, 461–62, 329 N.W.2d 143 (1983). The PSC " 'may exercise only such powers as the legislature has seen fit to confer upon it and those powers must be exercised in the manner prescribed.' " *Friends of the Earth*, 78 Wis. 2d at 400 (citation omitted).

¶ 23. In advancing this claim of error and its supporting arguments, Oak Creek remarkably fails to address the authority vested in the PSC by the calls of four separate statutes: Wis. Stat. §§ 196.30, 196.37(2), 196.39(1) and 196.58(5). Initially we note, under § 196.30, any public utility has the authority to file a complaint with the PSC in respect to any matter

138

affecting the service of the utility.[5] When Oak Creek expressed refusal to reconvey the water infrastructure asset without receiving compensation, it posed a threat to Franklin's compliance with the PSC's 1994 order and its statutory obligation to provide retail water service. In response, Franklin filed a complaint. Doubtless, the PSC had the authority to consider the complaint and provide a response.

¶ 24. Second, in its complaint, Franklin invoked WIS. STAT. § 196.39(1), which authorizes the PSC to alter or amend any of its own orders. Quite logically, this authority encompasses clarifications and explanation of previously issued orders affecting retail water services.

¶ 25. Third, under WIS. STAT. § 196.37(2), the PSC is authorized to determine and make just and reasonable orders relating to utility practices, acts, or services found to be unjust or unreasonable.

¶ 26. Fourth, WIS. STAT. § 196.58(5) grants to the PSC original and concurrent jurisdiction with municipalities to regulate the service of public utilities.

¶ 27. Finally, in *State Public Intervenor v. DNR*, 177 Wis. 2d 666, 675–76, 503 N.W.2d 305 (Ct. App. 1993), *rev'd on other grounds by* 184 Wis. 2d 407, 515 N.W.2d 897 (1994), we declared "an administrative agency has the power to reconsider its own decisions since the power to decide carries with it the power to reconsider." To accept Oak Creek's argument that the PSC is restricted to the terms of its 1994 order and prohibited from reasonably interpreting those terms

---

[5] WISCONSIN STAT. § 196.30 provides:

**Utilities may complain.** Any public utility may file a complaint with the commission on any matter affecting its own product or service.

139

and making subsequent orders by amendments implementing its public policy intent would fly in the face of the plain meaning of the statutory authority conferred upon it by the legislature. The question thus remains, did the PSC properly exercise its power.

¶ 28. The final decision of the PSC relates to the meaning of the order transferring retail water customers of Oak Creek residing in Franklin back to Franklin, and the reasonable implications flowing from that order of transfer. Thus, this appeal is narrowly focused on whether the PSC's final decision conformed to the authority granted to it and existing standards utilized to implement that authority. As noted above, the PSC has the power to rescind, change, or amend its previous decisions. The PSC has experience in dealing with retail water service contracts. Under the due weight standard, "an equally reasonable interpretation of a statute should not be chosen over the agency's interpretation." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 287 n.3, 548 N.W.2d 57 (1996). If an agency's interpretation of a statute complies with the statutory purpose and is reasonable, we shall not overturn it. *Responsible Use of Rural & Agric. Land v. Public Serv. Comm'n*, 2000 WI 129, ¶ 25, 239 Wis. 2d 660, 619 N.W.2d 888. The policy with which we are concerned is the requirement that a utility own the facility through which it provides services and whether the record before us reasonably supports how that policy was applied. With the reader's indulgence, we first examine the evidentiary record.

¶ 29. On December 10, 2003, the PSC conducted a contested hearing to examine the complaint of Franklin. Franklin alternatively invoked the authority of the PSC under Wis. Stat. §§ 196.58(5), 196.49(6), 196.49(2),

196.39 and 196.37(2).[6] Twelve witnesses testifiedthree on behalf of Franklin, six on behalf of Oak Creek, and three staff members of the commission. Most of the witnesses had participated in the events and proceedings that precipitated the December 28, 1994 order. Forming the basis of the PSC's decision and order are many undisputed facts and findings the PSC made under its

[6] WISCONSIN STAT. § 196.58(5) provides:

The commission shall have original and concurrent jurisdiction with municipalities to require extensions of service and to regulate service of public utilities. Nothing in this section shall limit the power of the commission to act on its own motion to require extensions of service and to regulate the service of public utilities.

WISCONSIN STAT. § 196.39 provides in pertinent part:

**Change, amendment and rescission of orders; reopening cases. (1)** The commission at any time, upon notice to the public utility and after opportunity to be heard, may rescind, alter or amend any order fixing rates, tolls, charges or schedules, or any other order made by the commission, and may reopen any case following the issuance of an order in the case, for any reason.

(2) An interested party may request the reopening of a case under s. 227.49.

(3) Any order rescinding, altering, amending or reopening a prior order shall have the same effect as an original order.

(4) Within 30 days after service of an order, the commission may correct an error or omission in the order related to transcription, typing or calculation without hearing if the correction does not alter the intended effect of the order.

WISCONSIN STAT. § 196.37(2) provides:

If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed in the future.

141

discretionary power. We shall first examine the uncontested facts.

¶ 30. From our review of the record the following relevant evidentiary facts are undisputed. First, from at least 1973, the PSC had a policy that whoever distributed the water service should own those assets used in the distribution. In the proceedings involving the three water agreements that form the vortex of this controversy, neither Oak Creek nor Franklin disputed the existence of this policy. Due to cash flow considerations generated by depreciation of these assets and rate application, Oak Creek was the beneficiary of this policy.

¶ 31. Second, Franklin donated or contributed the water mains and appurtenances (assets) to Oak Creek at no cost to Oak Creek for the distribution of retail water into its developing subdivisions. Third, the issue of compensation for the return of the water utility assets was never raised during the execution and approval process of the three water agreements. Fourth, by its December 28, 1994 decision, the PSC concluded and ordered that all Franklin residents who were receiving retail water service from Oak Creek would become retail water customers of Franklin at the termination of the two retail water agreements on October 8, 2003, subject to the approval of the PSC to prevent the disruption of services. There were no financial conditions attached to the order for transfer. At the time no party objected to the order, moved for reconsideration, or appealed from it.

¶ 32. We now examine the disputed testimony relevant to the fact finding of the PSC. Franklin's relevant testimony was presented by John Bennett, City Engineer, Director of Public Works for the City of Franklin and Manager of The Franklin Water Utility and by Norman McGarvie, Assistant City Engineer. For

Oak Creek, testimony of the same nature was presented by John Schmidt, the Administrative Supervisor of the Oak Creek Water Utility from August 1987, to May 1993; Don Ashbaugh, the general manager of the Oak Creek Water Utility; and Steven Yttri, who succeeded Ashbaugh. PSC staff presented testimony through Peter Feneht, David Sheard and Bruce J. Manthey.[7]

¶ 33. Franklin's witnesses presented their view that the 1994 agreement to transfer customers and service area necessarily included the transfer of the water distribution infrastructure. Bennett testified that it was his understanding that at the time of the approval of the retail water sales agreements, the PSC had a policy that the assets providing distribution followed the utility providing the service. Bennett explained that there was not any proposed accounting by any party for the payment of such assets in the retail area by Franklin in the 1994 proceeding before the PSC, when the costs of the Oak Creek plan for wholesale water were specifically before the PSC, because no one intended that there be any payment. Bennett opined "[i]t would simply be unfair, and therefore not in the public interest, to require Franklin to pay Oak Creek for assets it gave to Oak Creek without charge."

¶ 34. Bennett also testified in rebuttal to earlier testimony offered by John Schmidt, an Oak Creek witness. Schmidt, in his capacity as chief financial officer at the Oak Creek utility, stated he discussed many times with John Bennett and Norm McGarvie of

---

[7] The testimony in the record appears in two forms: Pre-filed transcribed testimony that was acknowledged by the witness in the open hearing and testimony taken at the open hearing, which included both direct and cross-examination. Some of the pre-filed testimony was also rebuttal to previously taken pre-filed testimony.

Franklin the terms upon which Oak Creek would be willing to convert the retail sales areas to wholesale areas. He stated he made it very clear to Bennett and McGarvie that Oak Creek would not just deed the assets located in these retail areas to Franklin. There would have to be some agreement. He explained that if these assets were transferred without compensation, Oak Creek's revenues would go down and he was not going to let that happen.

¶ 35. In rebuttal, Bennett claimed that Schmidt left Oak Creek in May of 1993. Discussions with Oak Creek pertaining to the wholesale agreement and the amendment to the 1979 agreement were not initiated until November or December of 1993. He denied he had any discussion with Schmidt, but he did talk to Don Ashbaugh, the General Manager of the Oak Creek Water Utility about the transfer of the retail areas between November 1993, and March 1994. The issue of transfer of assets, however, did not come up because it was understood that the assets would follow the provider. He and Ashbaugh agreed that payment would be made for the meters that Oak Creek had installed. Ashbaugh had advised him that the cost of the meters would have to be covered upon transfer of the retail areas. There was never any other requirement made. He never discussed with him the transfer of any assets except the meters.

¶ 36. Before Bennett concluded his testimony he was asked, "Why was there not any cost for reacquiring the Oak Creek retail mains in Franklin factored in the financial comparisons that were made in the alternatives, including plan C to your knowledge?" He responded, "Because we did not expect to pay any cost for those mains. They were given to Oak Creek at no cost."

¶ 37. Norman F. McGarvie testified in rebuttal to testimony from Oak Creek witnesses. He disputed Oak Creek's witnesses who testified that the transfer of

144

assets were further matters to be worked out. He understood that when the wholesale agreement was completed in 1994 and approved by the PSC, that it was a "done deal." Retail areas were to be transferred with Franklin simply paying Oak Creek for the depreciated cost of the meters and nothing more.

¶ 38. Ashbaugh's testimony was not long. He believed that Franklin would want the return of the assets in the two retail areas, but Franklin would have to reach an agreement with Oak Creek, which never occurred. He did not remember any discussion on what terms Franklin might acquire the Oak Creek assets, but he did remember that, before negotiations started, John Schmidt indicated to Franklin that Franklin would have to buy back the assets from Oak Creek; however, no price was discussed.

¶ 39. Steve Yttri testified on behalf of Oak Creek. He had formerly been a finance officer for the City of Franklin, but left for employment with Oak Creek in June 1993. He worked with Ashbaugh and acted as the principal negotiator for Oak Creek during the negotiation for the wholesale agreement. He is presently the General Manager of the Oak Creek Water Utility serving in that capacity since February 2, 2001. As pertinent, Yttri testified that Franklin, at the beginning of the negotiations concerning the wholesale agreement, submitted a draft agreement providing that Franklin did not have to pay for the transfer of the assets in the two retail areas. But this provision was not included in the final draft. It was Yttri's letter of February 7, 2003, requiring compensation for the transfer of assets that precipitated Franklin filing its complaint with the PSC.

¶ 40. The PSC staff's main witness was David Sheard. He appeared in the capacity of Assistant Administrator in the Division of Water, Compliance and Con-

145

sumer Affairs of the PSC.[8] Sheard testified for the stated purpose of providing an understanding of point 7 of the 1994 order, cited in this opinion, requiring the transfer of the Franklin resident customers to Franklin from Oak Creek. His understanding was that the order required that the customers, related water mains, and laterals were to be transferred back to Franklin at no cost. He opined that the transfer of customers would include the necessary transfer of assets to service those customers. His reasons for this opinion were that: (1) the water mains and laterals had been paid for by Franklin residents and conveyed to Oak Creek; (2) it was PSC policy that regulated water utilities must own the water mains they use to provide retail services to customers; (3) the PSC does not allow duplication of facilities within a single service area; and (4) the idea of transferring customers without assets is not reasonableif the intent was the opposite, he would have expected that it would have been well documented in the agreement. He further explained that the transfer of customers without the assets would have left Oak Creek with a facility it would no longer use or would have required Franklin to buy back what it had already paid for.

¶ 41. Additionally, he stated that none of the financial projections that were developed when the various alternative plans were considered for the wholesale agreement incorporated a buy-back provision. If a buy-back was intended, it would have had significant financial impact that would have had to be considered. Thus,

[8] Oak Creek filed a motion with the PSC to exclude the pre-filed testimony of Sheard, claiming his direct testimony was not within the scope of Wis. Admin. Code § PSC 2.03(1). Sheard was allowed to testify. Oak Creek has not filed an appeal relating to that motion.

146

the absence of such a provision indicated, in his judgment, a no-cost transfer.[9]

¶ 42. In reaching its decision, the PSC made ten findings of facts leading to its conclusions of law.[10] We paraphrase these findings and extract others from the

---

[9] Sheard testified that the estimated cost of the contributed infrastructure would be $4,991,754.16. This cost factor would have been a significant amount in evaluating the competing proposals in the 1994 contested proceeding. Sheard testified that in his capacity "he would have wanted that cost to have been reflected in the cost comparisons between Plan B and Plan C so as to enable the Commission to make an informed and meaningful decision."

[10]

### Findings of Fact

1. Oak Creek and Franklin are two adjacent municipalities in southern Milwaukee County sharing a common border.

2. On August 30, 1973, Franklin and Oak Creek entered into a 30–year Retail Water Service Agreement (the Southwood agreement) whereby Oak Creek agreed to supply retail water service to a specific defined residential area along the Franklin-Oak Creek border. The retail water service agreement between Franklin and Oak Creek was designed to provide the developing eastern portion of Franklin with a Lake Michigan water supply for 30 years until Franklin had the necessary infrastructure to provide the retail water services to its own residents.

3. On October 8, 1973, the Commission approved the Southwood agreement in docket CA-5463. The agreement was to expire October 8, 2003. Franklin agreed to construct, at its expense, all necessary water mains and appurtenances needed for the provisioning of retail service in the Southwood area and then to retail water service in the Rawson service area andthen to contribute those assets to Oak Creek so that Oak Creek could provide retail service over its own facilities.

4. On March 21, 1979, Franklin and Oak Creek again entered into a 30-year retail water service agreement (the Rawson agreement) similar in all relevant respects to the Southwood agreement except for termination date and area.

PSC's decision. *See Crowley v. Knapp*, 94 Wis. 2d 421, 429–30, 288 N.W.2d 815 (1980) (we are not obliged to follow a court's designation whether an item is a finding or a conclusion).

5. On May 10, 1979, the Commission approved the Rawson agreement in docket 4310-SV-1. The agreement was to expire May 10, 2009. Again Franklin agreed to construct and pay for all necessary water mains and appurtenances for the provision of retail water service in the Rawson service area and then to contribute those assets to Oak Creek so that Oak Creek could provide retail service over its own facilities.

6. On April 12, 1994, the City of Franklin submitted an application for authority to purchase wholesale water from Oak Creek (docket 2105–CW-100). The application stated, "It is the intent of this contract together with the attached amendment to terminate the Oak Creek Water Utility's retail service in the City of Franklin on October 8, 2003. At that time, all Oak Creek Utility retail customers in Franklin would become retail customers of the Franklin Water Utility." The contract amendment changed the Rawson [a]greement termination date from May 10, 2009, to October 8, 2003, to coincide with the termination date of the Southwood [a]greement. The City of Milwaukee intervened in the proceeding and objected to the application on the ground Milwaukee was a better source of wholesale water.

7. On December 28, 1994, the Commission approved Franklin's application. The Commission observed in its Findings of Fact, Conclusions of Law, Certificate and Order that, "The Oak Creek alternative involves transferring some water utility customers. Due to the growth pattern that developed, it was expedient for Oak Creek to provide retail service to about 1,000 customers who reside in Franklin. As stated in the application, these customers will be transferred from Oak Creek, so that they will become retail customers of Franklin by October 8, 2003."

8. Oak Creek was a full party participant in the proceeding that led to the Commission's Order in docket 2105–CW-100. Oak Creek drafted the wholesale water agreement and amendment to the Rawson [a]greement that Franklin agreed to and the Commission approved in docket 2105–CW-100. At no point during the proceedings did Oak Creek assert a right to compensation for the contributed assets at the termination of the Southwood and Rawson retail agreements.

148

¶ 43. The PSC found that during the years 1973 and 1979 it had approved two agreements executed by Oak Creek and Franklin whereby the former would supply the latter retail water services for a period of thirty years. It determined that because of its policy that a water utility provider ought to own the assets it uses to provide water services, Franklin should contribute the assets necessary to supply the retail by transferring such assets to Oak Creek.

¶ 44. It found that on December 28, 1994, it approved an application from Franklin to purchase wholesale water from Oak Creek pursuant to a contract executed by Oak Creek and Franklin. It was the intent of the contract to terminate the Oak Creek Water Utility retail service in Franklin on October 8, 2003. Furthermore, at that time, all Oak Creek retail custom ers in Franklin would become retail customers of Franklin. It further found that the PSC order changed the 1979 agreement termination date from May 10, 2009, to October 8, 2003, to coincide with the termination date of the 1973 agreement.

¶ 45. The PSC found, as a matter of fact, that Oak Creek was a full party participant in the proceedings that led to the December 28, 1994 order in docket 2105–CW-100; that Oak Creek drafted the wholesale water agreement and the amendment to the termination date for the

9. At no time did Oak Creek object to the Commission's Finding of Facts, Conclusions of Law, Certificate and Order issued in docket 2105–CW-100. Oak Creek has provided lake water to Franklin pursuant to the Wholesale Agreements approved in the docket.

10. Neither the Commission Order in docket 2105–CW-100, nor the record in docket 2105–CW-100, nor the wholesale agreement or its attachment amending the Rawson retail agreement, make any reference to Oak Creek being compensated for the assets that Franklin paid for and that were to be returned to Franklin on October 8, 2003.

1979 agreement, and at no point did Oak Creek assert any right to compensation for the contributed assets at the termination of the retail agreements.

¶ 46. It found that the cost of repurchasing infrastructure was not considered in the 1994 proceeding that compared Franklin's anticipated cost of wholesale supply from Milwaukee and Oak Creek with other alternatives that did not include the transfer of Southwood East and Rawson Water utility infrastructure.

¶ 47. Finally, as a matter of fact, Oak Creek never objected to the PSC's findings of fact, conclusions of law, certificate, or order in docket 2105–CW-100, nor does the PSC order in the same docket, nor the record, nor the wholesale agreement, nor the amendment to the 1979 retail agreement make any reference to Oak Creek being compensated for assets that Franklin originally paid for and donated to Oak Creek.

¶ 48. From this detailed review of the relevant evidence providing the basis for fact finding in this appeal, we conclude that the PSC's findings of fact are supported by credible and substantial evidence and we are thus bound by them.

## B. REASONABLENESS OF ORDER

¶ 49. There is little doubt that reasonableness and justice played a significant role in the PSC's decision. The unchallenged policy that the utility providing the retail water services ought to be the owner of the assets distributing those services to insure the highest level of services practicable is reasonably in the best public interest. The unreasonableness of a contrary policy was clearly demonstrated by PSC staff testimony.

¶ 50. In exercising its superintending power over water utilities, it is abundantly clear from the cited statutes that justice and fairness are hallmarks of PSC authority. The discharge of this responsibility contained in this authority could not be more graphically expressed than in the last paragraph of the PSC's decision.

> In the 1970s, Franklin paid for the water mains that service the Rawson and Southwood neighborhoods. Until the change in CIAC in 2001, these customers paid depreciation expense allocated to these assets as part of Oak Creek's rate structure. Oak Creek's demand for additional consideration would have these Franklin customers pay a third time for this infrastructure. This outcome would be manifestly unfair and contrary to the public interest.

¶ 51. Although there exists no four-cornered precedent for the PSC's final decision to order the return of the infrastructure assets to Franklin at no cost, the rationale for the order finds an apt foundation in public utility jurisprudence. Both our supreme court in *City of St. Francis v. Public Serv. Comm'n*, 270 Wis. 91, 97–99, 70 N.W.2d 221 (1955), and the PSC's decision in Investigation of the Accounting Treatment for Account 271, Contributions in Aid of Construction and Modification of the Uniform Systems of Accounts for Municipal Electric, Gas, Water and Sewer utilities, docket 05–US-105 (Apr. 2, 2001) addressed the inequity of consumers being required to pay for donated or contributed assets which "*a minore ad majus*" is exactly what would have happened here if the PSC had not interpreted its 1994 order as it did.

¶ 52. The PSC had the authority to alter, amend, or change its 1994 order based upon WIS. STAT. § 196.39(1) upon which it relied in its decision. Oak Creek's reliance upon concepts found in the law of

contracts, while reasonable in its interpretative offering, is not more reasonable than the PSC's interpretation. Hence its claims of error fail.[11]

*By the Court.*—Order affirmed.

¶ 53. FINE, J. (*dissenting*). In my view, this appeal is controlled by the written contracts between the City of Oak Creek and the City of Franklin. In the April 19, 1976, contract, Franklin agreed, in consideration for Oak Creek providing water to Franklin, to give to Oak Creek, without additional cost and "irrevocably," the Southwood water-infrastructure at issue here: "NOW, THEREFORE, the undersigned City of Franklin hereby irrevocably transfers, assigns, sets over and conveys to the City of Oak Creek, operating as a water public utility, and its water works system, all of its right, title and interest whatsoever in" the water-infrastructure that is the subject of this appeal. (Uppercasing in original.) Three and one-half years later, in a written contract dated November 6, 1979, Franklin agreed to "deed" to Oak Creek the Rawson water-infrastructure at issue here, and, concomitantly, Oak Creek agreed "to accept ownership of the watermains." In my view, these contracts both begin and end our analysis. *See Cernohorsky v. Northern Liquid Gas Co.,*

---

[11] Because of the reasons announced for the disposition of this appeal, the issue of judicial estoppel will not be addressed. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need to be addressed).

The dissent indicates disagreement with this opinion based on the "irrevocable" contracts between Franklin and Oak Creek. In response, we note that the contracts between Franklin and Oak Creek are subject to approval by the PSC and that the terms for those contracts have expired. With the expiration of the contracts, any "irrevocable" contract provision expires as well.

152

268 Wis. 586, 593, 68 N.W.2d 429, 433 (1955) (Contract language that is not ambiguous must be enforced as it is written "even though the parties may have placed a different construction on it.").

¶ 54. Although the Public Service Commission may, of course, rescind or modify its orders, it may not ignore and thus nullify the Oak Creek/Franklin contract, absent specific authority not present here that permits, in limited and carefully circumscribed situations, the impairment of contracts. *See* Wis. Const. art. 1, § 12 ("No . . . law impairing the obligation of contracts, shall ever be passed."); *State ex rel. Cannon v. Moran,* 111 Wis. 2d 544, 553–554, 331 N.W.2d 369, 374 (1983) (discussing prohibition against the impairment of contracts). Accordingly, I respectfully dissent.